1 | MARCUS FAMILY LAW CENTER, PLC
EDGARD GARCIA, BAR #263622
2 | ETHAN J. MARCUS, BAR #152240
CERTIFIED SPECIALIST, FAMILY LAW
3 | THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION
4 | 732 STATE STREET
EL CENTRO, CA 92243
5 | Telephone: 760/352-2800

FILED

2010 FEB -8 PM 2:04

CLERK
U.S. BANKRUPTCY CT.
SO DIST. OF CALIF.

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11 | In Re                                )
    |                                     )
12 | SAMUEL E. SINGH, Debtor              )        CASE NO. 08-07659-LT7
    | ———————————————————————————————    )
13 | MARCUS FAMILY LAW CENTER, PLC,       )        ADVERSARY NO. 08-90513
    |                                     )
14 |              Plaintiff,              )        **CLOSING BRIEF**
    |                                     )
15 | v.                                   )
    |                                     )
16 | SAMUEL E. SINGH,                     )
    |                                     )
17 |              Defendant.              )
    | ———————————————————————————————    )

18        This matter was heard on November 19, 2009. Plaintiff (Marcus Family Law Center,

19 PLC) and Defendant (Samuel E. Singh) were present with counsel and testimony was solicited

20 pertaining to the complaint and cross complaint. The following is presented as closing argument

21 on the issues raised by the complaint, cross complaint and any remaining issues addressed by the

22 court on the day of trial.

23                              <u>**FIRST ISSUE**</u>

24        **(Determination of Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))**

25        Pursuant to Title 11 U.S.C. §523(a)(2)(A) A discharge under section 727, 1141, 1228(a),

26 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money,

27 property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

28 false pretenses, a false representation, or actual fraud, other than a statement respecting the

1  debtor's or an insiders financial condition.  These types of discharges are defined not by the debt
2  itself but rather the conduct that caused the debt.  Those exceptions that rely exclusively on a
3  level of fault concern extremely serious actions done knowingly or with great risk of harm to
4  others. *In re Baylis* (1st Cir. 2002) 313 F3d 9, 18.  The exceptions defined by this case law and
5  code include those for services as seen in the matter at hand.  In order to have a debt exempted
6  from discharge under §523(a)(2)(A), the creditor must show: (1) the debtor made representations
7  that at the time the debtor knew to be false; (2) the debtor made those representations with the
8  intention and purpose of deceiving the creditor (scienter); (3) the creditor justifiably relied on
9  those representations; and (4) the creditor sustained losses as a proximate result of the debtor's
10  representations. *In re Eashai* (9th Cir. 1996) 87 F3d 1082, 1086; *In re Britton* (9th Cir. 1991)
11  950 F 2d 602, 604;  *In re Austin* (8th Cir. BAP 2004) 317 BR 525, 329-330.  Scienter has been
12  defined by the courts as "Either actual knowledge of the falsity of a statement, or reckless
13  disregard for its truth." *In re Grabau* (ND CA 1993) 151 BR 227, 234.
14      Case law has stated that scienter must be measured by the debtor's subjective intent at the
15  time of the transaction in which the debtor obtained the money, property or services.  However,
16  since fraudulent intent can rarely be proven directly, it may be inferred from the surrounding
17  circumstances. *In re Kennedy* 108 F 3d 1018.  The Ninth Circuit has adopted a "totality of the
18  circumstances" theory, under which a court may infer the existence of the debtor's fraudulent
19  intent not to pay a debt if the facts and circumstances of a particular case present a picture of
20  deceptive conduct by the debtor. *In re Eashai* (9th Cir. 1996) 87 F3d 1082, 1087.  Further, the
21  creditor must also demonstrate a causal nexus between the fraudulent conduct and the debt.  Such
22  that the debtor's fraud was a proximate cause of the loss to the creditor.  In the case at hand we
23  see through testimony that SAMUEL E. SINGH ("SAMUEL") retained MARCUS FAMILY
24  LAW CENTER, PLC ("MFLC") for legal services.  As a result of the retainer SAMUEL
25  effectuated a one page fee agreement which stated in part that "Attorney fees will be billed as
26  work is performed and expenses are incurred.  Payment is due immediately upon receipt by
27  CLIENT of a current bill... The Marcus Family Law Center, PLC shall have a lien upon any
28  money or property awarded or payable to CLIENT in this proceeding for any sums due under this

1   agreement.".  During the direct examination of SAMUEL he admitted that the agreement had

2   been signed, that he received the services at the core of the complaint and that he was aware of

3   the fee arrangement.  The crucial element to this action stems from SAMUEL's intent.  If we are

4   to follow the ninth circuits totality of the circumstances test we can apply several facts to the test.

5   Firstly, SAMUEL knew that he would be receiving an Equalization payment in excess of his debt

6   to MFLC.  He knew that the debt for services had far exceeded his retainer and he knew of the

7   lien attaching to the proceeds of the case. SAMUEL provided testimony that he arranged to

8   receive the equalization payment directly through his former spouse.  He also testified that he had

9   been told more then once that his remaining debt to MFLC would be paid through the proceeds

10  of his home refinance.

11          SAMUEL stated that MFLC Attorney Angela Z. Martinez (formerly Cotugno) informed

12  him of this fact on more then one occasion. This admission is important because it shows that

13  SAMUEL knew that his debt was to be paid through the proceeds of the case.  SAMUEL also

14  was informed of this fact prior to his arrangement with his former spouse to receive the funds

15  directly.  SAMUEL further acknowledged the lien on the proceeds of the case by stating to

16  MFLC Employee Maryjo Marquez that he (SAMUEL) expected that MFLC would be paid from

17  the equalization payment on the house.  Testimony was solicited from SAMUEL that this

18  representation was made several times before he received the payment from his former spouse.

19  SAMUEL further testified that when he arranged to receive the equalization payment directly

20  from his former spouse he mentioned his desire to pay back his brother and obtain a new vehicle.

21  Absent from his conversation with his former spouse was the intent to repay MFLC from the

22  proceeds as he had stated several times to three different employees of MFLC.  This was further

23  evidenced in the testimonies of MFLC employees Cindy Vallejo ("Cindy"), Maryjo Marquez

24  ("Maryjo") and Angela Z. Martinez Esq. ("Angela")(formerly Cotugno).  Cindy testified that on

25  June 10, 2008 SAMUEL stated to her that he would not be making a lump sum payment in spite

26  of receiving his equalization payment because he didn't have any money left.  Cindy further

27  testified that when she stated that SAMUEL had agreed to pay the balance on his account from

28  the equalization payment SAMUEL said that he knew that he had said that and that he was sorry,

1    there was nothing he could do, that he had paid us (MFLC) enough money and that he wasn't

2    going to give us any more.  Cindy also stated SAMUEL never disclosed that he had any

3    remaining funds in the bank.  Testimony was also solicited that SAMUEL made a representation

4    to Cindy that MFLC would be paid from the community interest in SAMUEL's former spouse's

5    retirement.  Ultimately, MFLC provided services which placed SAMUEL at a principle debt of

6    $12,472.74.

7            These services were provided pursuant to the signed fee agreement that outlined a

8    charging lien on any proceeds of the case.  During SAMUEL's dissolution of marriage he was

9    informed that he would be receiving an equalization payment due to his former spouse remaining

10   in possession of the family home.  SAMUEL made several representations to several MFLC

11   employees that his account would be paid through the proceeds of the divorce ("equalization

12   payment").  In spite of these representations and the charging lien being attached to the proceeds

13   of the case.  SAMUEL arranged to be paid directly from his former spouse.  MFLC contacted

14   SAMUEL when news of the payment was relayed by the former spouse's counsel.  On being told

15   that MFLC had knowledge of the transaction SAMUEL apologized and admitted that he had

16   represented that payment would be made from the equalization funds.  SAMUEL further

17   represented that payment would be made from the Qualified Domestic Relations Order (QDRO)

18   which would have a value upwards of $9000.00.  This representation coupled with all the

19   previous representations induced MFLC to continue rendering services in SAMUEL's dissolution

20   of marriage.  MFLC made a justifiable reliance that SAMUEL would settle his account in full

21   through the QDRO monies.  This representation was later proved to be false as SAMUEL

22   testified that he again made a separate arrangement with his former spouse to have his interest

23   bought out and directly paid to him.  This is of note because the $9000.00 payment was

24   effectuated after the bankruptcy and complaint had already been filed and no subsequent notice

25   of the value of this transaction was given either to the bankruptcy court, the bankruptcy trustee or

26   MFLC until it was solicited via deposition testimony on August 18, 2009.  If we are to apply the

27   ninth circuit courts totality of the circumstances test we must look at all of SAMUEL's

28   representations as a whole.  When this is done it is easy to infer that SAMUEL was aware of his

TRIAL BRIEF
cv\bk\singh.complaint                    Page 4 of  15

obligation to MFLC. This is evidenced by his representations to the firm by way of the firms employees. SAMUEL's admissions to arranging payment from his former spouse not once but twice is key to showing that the representations were false in that they were made with reckless disregard for the truth. This concept is more evident as pertaining to the second set of representations regarding the QDRO. Even after SAMUEL had already received his equalization payment he made a subsequent representation and further arrangement to receive payment despite the representation to make a payment on his account with the proceeds of the QDRO.

Testimony was also presented by SAMUEL that he had made several consultations with bankruptcy counsel before retaining there services. The timing of these consultations was not given in detail due to SAMUEL's convenient inability to recollect any dates which would make his bad acts clearer. However, the fact that these consultations occurred as early as 2007 was solicited in SAMUEL's testimony as he stated that he had been referred to the office by the person that was supervising his visitation with his daughter in 2007. Whenever these consultations occurred it is clear that it is before the representation regarding payment through the QDRO was made. The representations and SAMUEL's arrangements to receive payment directly from his former spouse when taken as a whole paint a picture of bad acts taken on behalf of SAMUEL to circumvent a payment process that by his own admission he knew would occur if the funds were sent through MFLC. These bad acts taken under the totality of the circumstances test infer the intent to defraud MFLC for services rendered and continued services (QDRO). These representations were justifiably relied upon by MFLC in incurring its losses by providing services and but for these representations MFLC (creditor) would not have given services and incurred a loss. Therefore, MFLC asks the court to deem the principle amount of $12,472.74 exempt from being discharged pursuant to Title 11 §523(a)(2)(A).

In regards to whether the 18% interest rate can be classified as usurious we respond that the constitutional limit for finance charges is 10%. However, because we are not in the business of giving credit we require that all balances be paid immediately upon receiving a current bill as outlined in the fee agreement signed by SAMUEL. Therefore in light of the fact that we require

1   immediate payment upon issuing a bill the additional 8% interest is a coercive measure to

2   encourage prompt payment in order to facilitate the closing of the account.

3

4

5                               **SECOND ISSUE**

6   **(Determination of Dischargeability of Debt Pursuant to 11 U.S.C. Section 727(a)(5))**

7          Pursuant to Title 11 U.S.C. §727(a)(5) The court shall grant a debtor a discharge, unless the

8   debtor has failed to explain satisfactorily, before determination of denial of discharge under this

9   paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.  Unlike a 523

10  action under Title 11 a denial of discharge pursuant to this section does not require any showing of

11  fraudulent intent. *In re Gannon* (BC SD NY 1994) 173 BR 313, 317; *In re Hermanson* (BC ND

12  IL 2002) 273 BR 538, 546.  Further, once it is shown that the debtor had a cognizable ownership

13  interest in a specific identifiable property at a time not too far removed from the date of filing his

14  petition, the burden is on the debtor to satisfactorily explain the loss of that particular asset. *In re*

15  *Beausoleil* (BC D RI 1992) 142 BR 31,37; *In re Lane* (BC D ID 2003) 302 BR 75, 81.  In this

16  matter SAMUEL failed to disclose the value of the QDRO that he was going to receive. It was

17  reported as unknown with a zero value.  SAMUEL knew that the value would not be zero as he had

18  made a representation that his debt with MFLC would be paid from this asset.

19          Further, after receiving the buy out in exchange for the QDRO he failed to report or account

20  for the $9000.00 payment.  This payment coupled with the approximately $7000.00 remaining from

21  the $28,686.50 equalization payment amounts to $16,000.00.  This asset was never explained away

22  as a loss, further SAMUEL's uncorroborated testimony may suffice if convincing to the court if not

23  convincing then sufficient corroboration must be given.  Testimony was given regarding the

24  whereabouts of the remaining $28,686.50 (New Truck, Payment to Scott Singh and Bankruptcy

25  Counsel).  However, no specific testimony was given regarding the whereabouts of the remaining

26  assets. SAMUEL failed to explain satisfactorily a loss of assets.  SAMUEL admits that he received

27  $28,686.50 on June 27, 2008 in his Statement of Affairs which he filed with the Bankruptcy Court

28  on or about August 13, 2008.  After receipt of those funds and prior to filing the Bankruptcy, the

only payments outside of normal living expenses which SAMUEL admits to are: 1) that SAMUEL

paid $2,190 to the Law Offices of JOHN F. Lenderman on July 4, 2008;  2) the same day, that

SAMUEL hired his bankruptcy attorney, he also paid $12,819.04 to Wachovia Dealer Services for

the purchase of a new vehicle; 3) SAMUEL paid Scott Singh $6200.00  That left SAMUEL with

approximately $7000.00.  After making the payment for his attorney his brother and his new car,

SAMUEL would have $7000.00 remaining.  SAMUEL does not account for the remainder of the

proceeds from the money he received June 27, 2008 in his papers which he signed August 12, 2008,

only 47 days after receiving the money.  There is not a satisfactory explanation of the loss of that

remaining money.

Given that SAMUEL filed bankruptcy to seek relief from $97,501.00 of unsecured debt he failed to

explain a loss of assets which could have paid 16% of his unsecured debt including 100% of the debt

owed to MFLC.  Due to the fact that a mere allegation of loss is insufficient to satisfy the

requirement. *In re Mezvinsky* (BC ED PA 2001) 265 BR 681, 689. coupled with the arguments and

law stated above we ask this court to hold that SAMUEL's discharge be denied pursuant to Title 11

U.S.C. §727(a)(5).

**THIRD ISSUE**

**(Determination of Dischargeability of Debt Pursuant to 11 U.S.C. Section 727(a)(2))**

Pursuant to Title 11 U.S.C. §727(a)(2) The court shall grant the debtor a discharge, unless

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged

with custody of property under this title, has transferred, removed, destroyed, mutilated, or

concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed

property of the debtor, within one year before the date of the filing of the petition; or property of

the estate, after the date of the filing of the petition.  An intent to defraud is not required merely

an intent to hinder or delay is sufficient. *In re Bernard* (9th Cir. 1996) 96 F3d 1279, 1281.  This

intent is based on a subjective standard and circumstantial evidence or inferences drawn from a

course of conduct are sufficient. *In re Adeeb* (9th Cir. 1986) 787 F2d at 1343.  Certain "badges

of fraud" have been found to be indicative of intent to hinder or delay.  These "badges of fraud"

include a close relationship between the debtor transferor and the transferee and a transfer that so

1   completely depletes the debtor's assets that the creditor has been hindered or delayed in

2   recovering any part of the assets. *In re Woodfield* (9th Cir. 1992) 978 F2d 516, 518.

3       Here we have examples of transactions which could fall under both of these "badges of

4   fraud" that prove indicative of an intent to hinder or delay a creditor.  First we have the

5   prepetition transfer ("payment") of $6,200.00 from SAMUEL to his brother Scott Singh.  This

6   transfer depleted the assets of SAMUEL at the expense of his creditors.  Second we have the

7   purchase of a 2008 Chevy Avalanche vehicle valued at $33,788.00.  This purchase was secured

8   with a down payment of $12,819.04 as well as the trade in of a vehicle worth $7000.00.  Both of

9   these transactions taken together severely depleted SAMUEL's assets at the expense of

10  SAMUEL's creditors.  Further, these transactions came only one month before SAMUEL filed

11  bankruptcy and after he had already consulted bankruptcy counsel as provided by SAMUEL's

12  testimony.  Due to these indicative "badges of fraud" we ask that SAMUEL's discharge be denied

13  pursuant to Title 11 U.S.C. §727(a)(2).

14                          **FOURTH ISSUE**

15  **(Determination of Dischargeability of Debt Pursuant to 11 U.S.C. Section 727(a)(4)(A))**

16      Pursuant to Title 11 U.S.C. §727(a)(4)(A) The court shall grant a debtor a discharge,

17  unless the debtor knowingly and fraudulently, in or in connection with the case made a false oath

18  or account.  A Debtor's omission of major assets from schedules by itself can establish the

19  existence of fraudulent intent. *In re Kindorf* (BC MD FL 1989) 105 BR 685, 690; *In re Keeney*

20  (6th Cir. 2000) 227 F3d 679, 685-686.  In this matter SAMUEL failed to disclose his property

21  interest in his former spouse's retirement plan.  He listed the asset as unknown and at a zero value

22  when he knew that the asset had value.  Ultimately he received a $9000.00 payment in exchange

23  for this listed asset and this amount was not reported to the trustee of the estate or to the court by

24  means of an amended schedule.  Further, SAMUEL failed to account or list the remainder of his

25  equalization payment which would have amounted to roughly $7000.00.  Taken together this

26  amounts to over $16,000.00 that was fraudulently omitted from the schedule signed and

27  submitted under penalty of perjury.  This constitutes the omission of multiple major assets.  This

28

1  in and of itself is grounds to grant our request to deny SAMUEL's discharge pursuant to Title 11

2  U.S.C. §727(a)(4)(A)

### FIFTH ISSUE

**(Determination of Validity of Attorney's Lien for Fees and Enforceability)**

7      Marcus Family Law Center, PLC secured an Attorney's lien for fees as shown in the

8  signed fee agreement as such discharge of the debtor's obligation to pay an attorney for

9  prepetition legal services does not prevent the attorney from enforcing a lien securing payment

10  for these services unless the lien has been disallowed or avoided during bankruptcy. ***Matter of***

11  ***Pacific Far East Line, Inc.*** (9th Cir. 1981) 654 F2d 664, 668-670; ***In re Anderson*** (BC SD OH

12  1988) 95 BR 506, 508.

13      A charging lien on the proceeds of the divorce case was voluntarily incurred pursuant to

14  the signed fee agreement.  Such liens are valid and legal, and may be created by a simple fee

15  agreement.  They are fully enforceable in California and an effective form of security device.

16  Priority of liens is determined in the order of creation of the liens.  Charging liens are created

17  concurrently with the execution of the contract (which is usually executed before the

18  commencement of any litigation) and thereby almost universally have priority over all other

19  creditors in any given action (California Civil Code §2881, 2883, 2897; ***Cetenko v. United***

20  ***California Bank*** (1982) 30 Cal. 3d 528, 179 Cal. Rptr. 902; ***Saltarelli & Steponovich v.***

21  ***Douglas*** (1995) 40 Cal. App. 4th 1, 46 Cal. Rptr. 2d 683.

22      A charging lien gives the attorney an equitable interest <u>pro tanto</u> in the client's claim (the

23  proceeds of the client's recovery) as security and entitles the attorney to "any available equitable

24  remedy necessary to effect payment" of the fees and costs due the attorney ***Epstein v. Abrams***

25  (1997) 57 Cal. App. 4th 1159, 67 Cal. Rptr. 2d 555.

26      A "notice of lien" is permissible but not required to perfect the charging lien (***Cetenko*** at

27  533, 179 Cal. Rptr. at 905 fn. 5, attorney's notice of lien filed in litigation deemed "in excess of

28  caution" and "superfluous" to determination of its priority; see also ***Saltarelli*** at 6-7, 46 Cal. Rptr.

2d at 687).  Nor is it necessary to file a Uniform Commercial Code (UCC) financing statement with the Secretary of State.  The UCC requires such filing only in connection with commercial security transactions within the purview of UCC Div. 9 (California Commercial Code §9301-9303, 9312, 9401).  This specifically excludes attorney charging liens (California Commercial Code §9401; *Saltarelli* at 7, 46 Cal. Rptr. 2d at 687).

There is only one exception to the above.  A charging lien may not be enforced against collected child support payments or child support arrears.  This exception is carved out due to the paramount public interest in ensuring that minor children are adequately supported.  Charging liens are enforceable when applied to spousal support or any other proceed of a divorce case such as an equalization payment as seen in the matter at hand.  Like other secured debts, a charging lien as described above survives the discharge of the fee obligation in bankruptcy [*Saltarelli* at 5, 46 Cal. Rptr. 2d at 686 (citing 11 U.S.C. §506(d), 522(c)(2); *In re Dickenson* (BR SD Cal. 1982) 24 BR 547, 550)].

The amount of recovery is computed pursuant to the fee agreement.  If an hourly rate was agreed upon, discharged counsel is entitled to recover an hourly rate fee for the time expended on the case until termination *Countryman v. California Trona Co.* (1917) 35 Cal. App. 728, 736; *Oliver v. Campbell* (1954) 43 Cal. 2d 298, 306.  If the discharged attorney has a contractual lien on the client's recovery, the lien survives the discharge of said attorney *Spires v. American Bus Lines* (1984) 158 Cal. App. 3d 211, 216; 204 Cal. Rptr. 531, 533; *Hansen v. Jacobsen* (1986) 186 Cal. App. 3d 350, 356; 230 Cal. Rptr. 580, 584).

MFLC secured a legally valid charging lien upon the proceeds of SAMUEL's dissolution action.  This charging lien was secured by means of a fee agreement signed by SAMUEL.  SAMUEL's dissolution resulted in an equalization payment in the amount of $28,686.50.  These monies were the proceeds of the case.  With this money SAMUEL secured a 2008 chevy avalanche and made two payments one to his brother Scott and one to his bankruptcy counsel John. F. Lenderman.  Due to the case law presented we ask that in the event that SAMUEL's discharge is granted that the MFLC charging lien be found valid and the issue of the reasonable

cost of service be remanded to the family court which held jurisdiction over the dissolution. (Imperial County Superior Court).

## SIXTH ISSUE

**(Responses to Defendant's Cross Complaint Title 15 U.S.C. §1601 and Affirmative Defenses Business and Professions Code 6148 and Professional Conduct Rules 3-300 & 3-310)**

Pursuant to Title 15 U.S.C. §1601 The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices. Defendant has alleged that MFLC violated these practices in effectuating a fee agreement with defendant. MFLC responds that it is currently and always has been a law firm which renders legal services for hourly fees secured through retainer. In the event that a client goes over their individual retainer they are asked to replenish their account or in the event that an equalization payment will be due to the client at the close of their case services are continued on the basis that due to the charging lien disclosed in the fee agreement MFLC will collect from any proceeds of the case. This is the situation that presented itself with SAMUEL. At no time did MFLC extend credit to SAMUEL. MFLC is not in the business of consumer credit thereby falling outside of the scope of congress' intent in effectuating Title 15 U.S.C. §1601. Therefore we request that Defendant's cross claim be denied on the basis that MFLC is not in the business of extending consumer credit as defined within the provisions of Title 15.

Defendant has asserted that the fee agreement signed by SAMUEL is not valid due to California Business and Professions Code §6148. This section states that in any case not coming within Section 6147 in which it is reasonably foreseeable that total expense to a client, including attorney fees, will exceed one thousand dollars ($1,000), the contract for services in the case shall

be in writing. At the time the contract is entered into, the attorney shall provide a duplicate copy of the contract signed by both the attorney and the client, or the client's guardian or representative, to the client or to the client's guardian or representative. The written contract shall contain all of the following: (1) Any basis of compensation including, but not limited to, hourly rates, statutory fees or flat fees, and other standard rates, fees, and charges applicable to the case. (2) The general nature of the legal services to be provided to the client. (3) The respective responsibilities of the attorney and the client as to the performance of the contract. (b) All bills rendered by an attorney to a client shall clearly state the basis thereof. Bills for the fee portion of the bill shall include the amount, rate, basis for calculation, or other method of determination of the attorney's fees and costs. Bills for the cost and expense portion of the bill shall clearly identify the costs and expenses incurred and the amount of the costs and expenses. Upon request by the client, the attorney shall provide a bill to the client no later than 10 days following the request unless the attorney has provided a bill to the client within 31 days prior to the request, in which case the attorney may provide a bill to the client no later than 31 days following the date the most recent bill was provided. The client is entitled to make similar requests at intervals of no less than 30 days following the initial request. In providing responses to client requests for billing information, the attorney may use billing data that is currently effective on the date of the request, or, if any fees or costs to that date cannot be accurately determined, they shall be described and estimated. (c) Failure to comply with any provision of this section renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee. (d) This section shall not apply to any of the following: (1) Services rendered in an emergency to avoid foreseeable prejudice to the rights or interests of the client or where a writing is otherwise impractical. (2) An arrangement as to the fee implied by the fact that the attorney's services are of the same general kind as previously rendered to and paid for by the client. (3) If the client knowingly states in writing, after full disclosure of this section, that a writing concerning fees is not required. (4) If the client is a corporation. (e) This section applies prospectively only to fee agreements following its operative date. (f) This section shall become operative on January 1, 2000.

It is true that the fee agreement was only signed by SAMUEL and not by a legal representative of MFLC; this fact makes the agreement voidable at the option of the client. However, even if voided the attorney is entitled to collect a reasonable fee as stated in subsection (c). Further an arrangement as to the fee implied by the fact that the attorney's services are of the same general kind as previously rendered to and paid for by the client is not applicable or voidable as stated in subsection (d)(2). Further, other then the actual bankruptcy proceeding at no time did SAMUEL ever assert that the fee agreement was void nor did he attempt to have the agreement voided pursuant to this clause. Even if this right was asserted and the fee agreement was found to be void MFLC would still be entitled to reasonable attorney fees.

Defendant further argues that pursuant to California Professional Conduct Rules 3-300 and 3-310 coupled with the holding in *Fletcher v. Davis* (2004) 106 Cal. App. 4th 398 that the charging lien secured by MFLC was adverse in interest to SAMUEL and thus did not comply with Rule 3-300 which states that any fee agreement that is adverse in interest to a client must be secured with informed written consent. Case law states that charging liens are inherently adverse in interest because they can delay the payment of proceeds while the issue of payment of fees and the charging lien are resolved. Thus, charging liens being adverse in interest pursuant to Rule 3-300 must meet the following requirements: (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and (C) The client thereafter consents in writing to the terms of the transaction or acquisition. In *Fletcher* the court found that the charging lien was not valid due to the main fact that it did not meet the requirements under Rule 3-300 because the charging lien was an **oral** agreement. This is distinguishable from the matter at hand because SAMUEL was furnished a fee agreement which outlined the fact that MFLC was securing a charging lien on the proceeds of the case. This agreement was signed by SAMUEL and the only requirement that was not fulfilled was the written advice that SAMUEL could seek independent counsel to review the agreement. *Fletcher* is not dispositive as to how

failing to complete this requirement effects the charging lien due to the fact that in *Fletcher* there was no written instrument outlining the charging lien as was secured and signed by SAMUEL in this matter.  Upon further probing of the Rules of Professional Conduct the advisory footnote states that Rule 3-300 is not meant to apply to retainer agreements unless the retainer agreement proposes to take an interest in the clients property such as with a charging lien.  However, the Rules do state that these retainer agreements that do wish to secure a charging lien are bound by Rule 4-200 which states:  (A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.  (B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

(1) The amount of the fee in proportion to the value of the services performed.  (2) The relative sophistication of the member and the client.  (3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.  (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.  (5) The amount involved and the results obtained.  (6) The time limitations imposed by the client or by the circumstances.  (7) The nature and length of the professional relationship with the client.  (8) The experience, reputation, and ability of the member or members performing the services.  (9) Whether the fee is fixed or contingent.  (10) The time and labor required.  (11) The informed consent of the client to the fee.  Using the above professional conduct rules and previous case law it would be difficult to classify the MFLC fee agreement signed by SAMUEL as unconscionable.  Therefore, due to the fact that this matter is distinguishable from *Fletcher* because a written agreement was secured and signed and the fees cannot be called unconscionable pursuant to Rule 4-200.  MFLC requests that Defendant's defense to have the charging lien declared null and void be denied.

In conclusion, on the day of trial the court mentioned case law pursuant to *Johnson v. Home State Bank* (1991) 501 U.S. 78.  After reading and analyzing the case law it appears that

1  the opinion focuses on chapter 13 rescheduling of a claim after it has been discharged under a

2  chapter 7 bankruptcy.  While the case law provides insight into what constitutes a claim and how

3  it can attach to property or debt discharged under a chapter 7 bankruptcy it does not appear to

4  share any analogous law or argument which would benefit the discussion in this matter.  If this is

5  an oversight on our behalf we humbly request that the court exercise their option to request

6  additional briefs and outline what specific section of the case law should be discussed.

7

8

9

10

11

12

13  Dated: 2/8/10

14

15          MARCUS FAMILY LAW CENTER, PLC

16

17

18

19

20

21

22

23

24

25

26

27

28