1 | **WRITTEN DECISION - NOT FOR PUBLICATION**

ENTERED *10/23/10*

FILED

APR 2 3 2010

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Bankruptcy No. 08-07659-LT7 |
| Samuel E. Singh, | ) Adversary No. 08-90513-LT |
| Debtor. | ) |
| | ) |
| Marcus Family Law Center, PLC, | ) MEMORANDUM DECISION |
| Plaintiff, | ) |
| v. | ) |
| Samuel E. Singh, | ) |
| Defendant. | ) |
| | ) |
| Samuel E. Singh, | ) |
| Cross-Claimant, | ) |
| v. | ) |
| Marcus Family Law Center, PLC and Ethan Marcus, | ) |
| Cross-Defendants. | ) |

1

**INTRODUCTION**

2      Plaintiff Marcus Family Law Center (hereinafter, "Creditor") seeks a determination

3 that its claim against debtor Samuel Singh ("Debtor") is non-dischargeable under 11 U.S.C.

4 § 523(a)(2)(A).[1]  Creditor alleges that Debtor obtained legal services from Creditor through

5 fraud.  Creditor also seeks a determination that Debtor is not entitled to a discharge in his

6 chapter 7 case  under 11 U.S.C. § 727 (a)(2), (4), and (5).  Creditor alleges that Debtor

7 transferred assets in fraud of creditors, made false oaths in connection with this case, and

8 failed to satisfactorily explain a loss of assets.

9      Debtor answered the complaint and filed a separate pleading captioned "Cross Claim

10 to Determine Nondischargeability of Debt" (the "Cross Claim," docket #6).  The Cross

11 Claim purports to be an action under the Truth in Lending Act and seeks a damage award.

12 Debtor alleges that Creditor and Ethan Marcus ("Marcus", and together with Creditor,

13 "Cross-Defendants") failed to make allegedly required financial disclosures in connection

14 with the Fee Agreement attached as Exhibit A to the complaint.  The Cross-Claim alleges

15 that the Fee Agreement contains a provision that requires payment of 1.5% interest on

16 unpaid legal fees incurred during Creditor's legal representation of the Debtor.

17      Trial was held on November 19, 2009.  Closing arguments were made in writing by

18 post-trial briefs ("Closing Briefs"), and the Court took the matter under submission.  The

19 Court has considered the testimony and demeanor of witnesses at trial, the documentary

20 evidence submitted, and the arguments of counsel in the Closing Briefs.  For the reasons set

21 forth in this Memorandum Decision, the Court now determines that Debtor's discharge must

22 be denied under 11 U.S.C. § 727(a)(5). The Creditor has shown by a preponderance of the

23 evidence that Debtor received a substantial cash payment on the eve of bankruptcy and that

24

25

26 [1]      Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
Code, 11 U.S.C. §§101 – 1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001 –
27 9037, as revised by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.
L. 109-8, 119 Stat. 23.  All references to the transcript of the trial and admitted exhibits in this
28 adversary proceeding, shall be cited as "Tr.__:__", and "Ex. __ ", respectively.

2

Debtor has not provided evidence of the use and/or location of a significant portion of such funds.

As to the Cross Claim, the Court declines to grant judgment for the reasons and grounds discussed below.

## BACKGROUND

On August 28, 2006, Debtor retained the Creditor to represent him in connection with the dissolution of his marriage. In connection therewith, Debtor executed a Fee Agreement dated August 28, 2006. *See* Ex. 1. The Fee Agreement provides for monthly billing and payment of legal services at rates purportedly set forth in attached "Fee Schedules." Neither party submitted Fee Schedules at trial. The single-page Fee Agreement was signed solely by Debtor and provides that "[a]ny balance over one month past due shall be subject to a finance charge pursuant to Schedule J (which is subject to reasonable change without prior notice)." Neither party offered "Schedule J" at trial. The Fee Agreement also provides that Creditor "shall have a lien upon any money or property awarded or payable to [Debtor] in this proceeding for any sums due under this Agreement." Debtor provided a retainer of $3,060, which he obtained through a credit card cash advance.

The dissolution was apparently acrimonious. Ultimately, Debtor advised Creditor that Debtor could no longer afford legal representation and terminated the relationship on approximately June 5, 2007. By this time, Debtor had paid all fees and costs to Creditor and had no outstanding balance owed. Ex. 2.

On approximately June 29, 2007, Debtor again contacted Creditor and requested assistance. Debtor was in critical need of legal services as his ex-wife had leveled charges of child abuse against him and, as a result, his access to his daughter had been severely limited. On July 2, 2007, Debtor paid another retainer to Creditor, this time in the amount of $10,000. Once again, Debtor obtained these funds through a credit card cash advance.

Debtor's second retainer was depleted by October of 2007, and he made only small and infrequent payments thereafter due to his poor financial condition. Thus, the unpaid fee balance owed to Creditor grew. Debtor did, however, borrow $6,200 from his brother in

1  order to pay the doctors making the evaluations and determinations regarding the child
2  abuse charges.  Based on the testimony of witness Cynthia Vallejo, one of Creditor's
3  employees, the Court finds that Creditor knew that Debtor borrowed this amount from his
4  brother.  The evidence also is clear that at all relevant times the Debtor was candid with
5  Creditor regarding his poor financial condition and his inability to pay Creditor's fees on an
6  as-incurred basis.

7        As noted above, Debtor only made small payments during the course of the
8  dissolution litigation whenever advance retainers had been exhausted.  Creditor claims that
9  Debtor accrued $12,947.98 in unpaid fees.  At some point in the representation,  Ms. Vallejo
10  discussed with Debtor the payment of legal fees through an assignment of an equalization
11  payment owed to Debtor by his ex-wife (the "Equalization Payment").  The evidence of
12  these conversations is murky,[2] but, at the earliest, it appears that the discussions occurred in
13  February or March of 2008.  By that time, the balance of unpaid legal fees was between
14  $9,900.59 and $11,716.58.  Ex. 2.[3]  There is no evidence that Creditor had any prior
15  discussions with Debtor regarding the Equalization Payment as a source of payment of fees
16  incurred.  After this discussion, Creditor provided additional legal services in an amount
17  most likely between $3,047.39 and $1,231.40.[4]

18        Debtor received the Equalization Payment on June 27, 2008 in the amount of
19  $28,686.50.  He used these funds to repay $6,200 to his brother shortly after June 27, 2008;
20  to make a down payment of $12,500 on a new vehicle on July 4, 2008; and to pay a $2,190
21  retainer to his bankruptcy attorney on July 9, 2008.  Debtor testified that any amounts in his
22  bank account at the time of the filing were Equalization Payment proceeds as he did not

25  [2]  Ms. Vallejo testified that she believed the discussion took place right before going to trial in April of 2008.

26  [3]  The pages of Ex. 2 are not numbered.  The amounts represent the ending balances shown as
27  of February 29, 2008 and March 31, 2008, respectively.

28  [4]  The amount differs depending on the actual date of the discussion.

4

1   have any other source of funds in excess of expenses.  Consistent with this testimony, his

2   schedule J reflects a net monthly income of negative $195.61 ("Excess Expense Amount").

3       Debtor initiated his chapter 7 case on August 12, 2008 (the "Petition Date").  He

4   scheduled a total of $2,682.90 in his checking and savings accounts.

5       He also scheduled a retirement asset (the "QDRO") with an "unknown" value.  Post-

6   petition, Debtor informally negotiated a settlement of the QDRO asset with his ex-wife.

7   The evidence establishes that under this settlement Debtor waived his right to any portion of

8   his wife's retirement assets in exchange for her agreement that he retain 100% of his own

9   retirement assets.  The evidence also establishes that this settlement was favorable to his ex-

10  wife and was not approved by the Court.

11      If one assumes that the entire amount in Debtor's accounts consists of Equalization

12  Payment proceeds (after payment of all the foregoing itemized amounts, including two

13  months of the Excess Expense Amount), then $4,722.38 of the Equalization Payment

14  remains unaccounted for by Debtor.

15

16              **SECTION 727 DISCHARGE OBJECTIONS**

17  **A.      Legal Standards for Denial of Discharge for Failure to Satisfactorily Explain**

18  **Loss of Assets – 11 U.S.C. § 727(a)(5).**

19      Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless:

20  ". . . the debtor has failed to explain satisfactorily, before determination of denial of

21  discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's

22  liabilities." 11 U.S.C. § 727(a)(5).  The objecting party bears the burden of proving that the

23  debtor's discharge should be denied by a preponderance of the evidence. *Khalil v.*

24  *Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007);

25  Fed. R. Bankr. Proc 4005.

26      A claim for denial of discharge under section 727 is construed liberally in favor of

27  the debtor and strictly against those objecting to discharge. *Lansdowne v. Cox (In re Cox)*,

28  41 F.3d 1294, 1297 (9th Cir. 1994).  Nonetheless, the bankruptcy discharge is equitable in

5

1   nature and is intended only for honest debtors. *In re Adeeb*, 787 F.2d 1339, 1345 (9th Cir.

2   1986). As one court noted: "The case authorities have frequently repeated the aphorism

3   that bankruptcy entitles honest debtors to a fresh start, not a head start. And it is perhaps for

4   that reason that the governing statute regards '*any* loss . . . or deficiency of assets' (emphasis

5   added) which is insufficiently explained to constitute a ground for denial of discharge."

6   *In re Hacker*, 90 B.R. 994, 997 (Bankr. W.D. Mo. 1987).

7        The objecting party has the initial burden of showing the disappearance of

8   identifiable assets no longer available for the debtor's creditors. *Nuvell Credit Corp. v. Ross*

9   *(In re Ross)*, 359 B.R. 690, 700 (Bankr. N.D. Ill. 2007). The burden then shifts to the debtor

10  to satisfactorily explain the loss of those assets. *Id*. A bankruptcy court has broad power to

11  deny discharge where the debtor does not satisfactorily explain a shortage, loss, or

12  disappearance of assets. *Matter of D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996). Fraudulent

13  intent need not be shown when a debtor fails to provide a satisfactory explanation.

14  *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 365 (Bankr. N.D. Ill. 2002).

15       What constitutes a "satisfactory" explanation is left to the discretion of the court.

16  *In re Ross*, 359 B.R. at 700. To be satisfactory, "a debtor's explanation must be a good faith

17  explanation of what really happened to the assets in question." *Olson v. Potter (In re*

18  *Potter)*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988); *and see In re Bostrom*, 286 B.R. at 364

19  ("The court is not concerned with the wisdom of a debtor's disposition of assets, but is

20  concerned with the truth, detail and completeness of the debtor's explanation of the loss.")

21       A debtor's explanation can only be satisfactory if it is "plausible enough to 'eliminate

22  the need for the court to speculate as to what happened to all the assets.'" *D'Agnese*, 86 F.3d

23  at 734. Thus, the debtor's explanation must consist of more than a "vague, indefinite and

24  uncorroborated hodgepodge of financial transactions." *In re Baum*, 359 F.2d 811, 814

25  (7th Cir. 1966). But, a debtor's explanation can be satisfactory without documentation

26  corroborating the loss; although, the absence of records is relevant to the credibility of the

27  explanation. *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 840 (Bankr. N.D. Ohio

28  2004).

6

**B.    Creditor Has Established The Disappearance Of Identifiable Assets Of The Debtor.**

The Court finds that Creditor met its burden of proof and established that Debtor had identifiable assets of at least $4,722.38 of cash proceeds that are no longer available for creditors.  Creditor established this loss of Debtor's assets through the following:  On June 27, 2008 – only 46 days prior to the Petition Date – Debtor received an Equalization Payment of $28,686.50 from his ex-wife.  At trial, Debtor admitted to making the following payments from the Equalization Payment: $6,200 repayment to his brother; $12,500 to Wachovia Dealer Services toward the purchase of a new truck; and $2,190 to Debtor's bankruptcy attorney.  The Court assumes that Debtor made two payments equal to Debtor's monthly budget shortfall and that all amounts in Debtor's two bank accounts (listed in Schedule B as $5.00 and $2,677.90) were paid from the Equalization Payment.

After deducting all of these payments and bank account balances from the Equalization Payment, the Court finds that the Debtor should have had at least $4,722.38 (the "Missing Money") remaining from the Equalization Payment.  Therefore, the Court finds the Creditor has met its burden of establishing the loss of identifiable assets of Debtor.

**C.    The Missing Money Is Substantial (If Substantiality Must Be Established).**

The Court recognizes that some jurisdictions require that the debtor's lost assets be substantial assets; while other jurisdictions make no reference to the substantiality of the assets in question.  For those jurisdictions that do require that the assets be substantial in order to justify denial of discharge, no further guidance is provided as to what distinguishes substantial assets from non-substantial assets; the courts' only focus is on whether the debtor's explanation is satisfactory.  The rare cases where substantiality is at issue tend to involve assets with no appreciable value. *See Farmers Nat'l Bank of Canfield v. Kolbfleisch (In re Kolbfleisch)*, 97 B.R. 351, 356 (Bankr. N.D. Ohio 1989).

Because section 727(a)(5) refers to "any" loss or deficiency of assets, this Court believes substantiality can be established, if necessary, with minimal difficulty in most cases.  True, much of the case law involves lost assets of higher value than in the present

7

1 case. This Court, however, believes that a cash asset is substantial for section 727(a)(5)

2 purposes unless the value of the lost assets is only nominal.

3      Here, the Court finds it particularly significant that the lost assets consisted of cash,

4 which would have been immediately available to creditors and required little or no

5 administrative expense to recover, liquidate, and distribute. Also, the Court notes that

6 Debtor received this cash a very short time before filing this case. Thus, his inability to

7 explain this loss of funds further supports a substantiality finding.

8      Decisions discussing the materiality requirements of section 727(a)(4) also suggest a

9 low threshold for substantiality. "A false statement is a material fact if it bears a

10 relationship to the debtor's business transactions or estate, or concerns the discovery of

11 assets, business dealings, or the existence and disposition of the debtor's property." *Fogal*

12 *Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999). "A

13 false statement or omission may be material even if it does not cause direct financial

14 prejudice to creditors." *Id.* at 63. Applying a similar standard here, the Missing Money is

15 clearly substantial, as it (or assets purchased with this cash) clearly would be part of

16 Debtor's estate if identified.

17      For all the above reasons, plus the fact that Debtor's counsel bewilderingly

18 acknowledges that case law holds that any amount over $1,000 is substantial (although no

19 citation is provided), this Court finds that the Missing Money is substantial for the purposes

20 of a section 727(a)(5) analysis.

21 **D.    Debtor Does Not Satisfactorily Explain The Loss Of Assets.**

22      The Court finally finds that Debtor fails to provide a satisfactory explanation for the

23 loss of the Missing Money and is, therefore, appropriately denied discharge under

24 section 727(a)(5). The Court does not deny discharge because Debtor improperly used these

25 funds. Instead, discharge denial is appropriate because Debtor provides no evidence of the

26 use and/or location of the Missing Money. Debtor provides no documentation establishing

27 that he still holds these assets. Debtor fails to account for use of these assets. Debtor was

28 provided the opportunity to explain the loss of assets at trial. The Court does not find

8

Debtor's explanation to be satisfactory as it is does not establish a good faith effort by Debtor to explain the loss of assets and is not plausible enough to no longer require the Court to speculate as to what happened to the assets.

At trial, Debtor admitted to three payments made from the Equalization Payment. When asked where the remaining funds were, Debtor testified that the remaining funds stayed in the account. Based on Debtor's account balance, they clearly did not. The only testimony Debtor provides as to further disposition of the Equalization Payment was that he repaid "multiple people" from whom he had borrowed money in the amounts of "a hundred here, forty there, but, no, it was nothing significant." Tr.46:1-2. Debtor then stated, "But the rest of the money was basically in the account." Tr.46:2-3.

The Court finds this explanation wholly unsatisfactory. As the Court has already noted, $4,722.38 should have remained.[5] As to Debtor's claims that the remaining Equalization Payment funds were in his bank account, Debtor provides no records to that effect and his schedules are inconsistent with this assertion. While documentation is not a requirement of a satisfactory explanation, when a debtor claims missing assets are in a bank account the absence of documentary proof is a substantial impediment to giving credibility to the debtor's explanation. And the testimony regarding other payments is nothing more than a "vague, indefinite and uncorroborated hodgepodge of financial transactions." Even if Debtor made some of these indefinite small disbursements of funds, the Court finds that the Debtor's testimony indicates that more of the Missing Money should have remained in Debtor's possession.

Further, the short time period between the payment of the Equalization Payment (June 27, 2008) and the Petition Date (August 12, 2008), leaves the Court further perplexed as to why Debtor is unable to provide *any* distinct details to explain the loss of cash. The Court finds it suspicious that the Debtor almost entirely depleted the Equalization Payment

---

[5] It should again be emphasized that this amount could be larger as the Court only arrives at the amount of $4,722.38 after generously assuming the Excess Expense Amount for two months came solely from the Equalization Payment.

9

immediately prior to filing for bankruptcy. The depletion is only made more suspicious by Debtor's inability to provide anything other than vague and uncorroborated descriptions of his financial transactions during this short period of time. The Court determines that the time period was short enough that Debtor should be able to recollect and provide, at the very least, some minimum detail as to where the Missing Money went.

Without the ability to show the Missing Money in his bank accounts and without any additional, even mildly detailed, explanation of where the assets may have gone, Debtor not only provides an unsatisfactory explanation for the disappearance, Debtor essentially fails to provide any explanation at all. And finally, the surrounding circumstances do not allow the Court to independently reach a reasonable inference as to where this Missing Money may have gone. For instance, in Debtor's Schedule J, he reports a monthly net income of negative $195.61. This small monthly income negative does not allow the Court to infer that Debtor consumed the lost assets through ordinary living expenses over a period of less than two months.

Consequently, because the Court finds Debtor's explanation of loss of assets insufficient, the Court denies discharge to the Debtor pursuant to section 727(a)(5).

**E.    Creditor's Claims Under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A) Fail.**

Due to the Court's decision to deny discharge under section 727(a)(5), determinations based on the section 727(a)(2)(A) and (a)(4)(A) grounds for denial of discharge have no effect on the outcome of this adversary proceeding. Nonetheless, the Court finds that the Creditor fails on these particular causes of action and provides a brief analysis.

The Court finds that the Debtor did not transfer property within one year before filing bankruptcy with the requisite intent to hinder, delay, or defraud creditors. Creditor alleges that Debtor paid his brother and purchased a new truck with the intent to hinder, delay, or defraud Creditor because both transfers occurred only a few months prior to the Petition Date. The Court does not agree.

There is nothing in the Bankruptcy Code that prevents the Debtor from spending money prior to the Petition Date. Creditor provides no evidence establishing that Debtor

10

had the requisite intent to hinder, delay, or defraud, other than the timing of these payments.
Debtor contends that the payment made to his brother was an appropriate repayment for a
loan and that the purchase of the truck was necessary to replace his old, broken down
vehicle. The Court finds Debtor's testimony honest and credible in this regard and
concludes that Debtor made these transfers for appropriate reasons and not with intent to
hinder, delay, or defraud creditors.[6]

As to the Missing Money, the evidence is inconclusive. It is not clear that it was
transferred. And intent to defraud was not shown. On this record, denial of discharge under
section 727(a)(5) is more appropriate.

Creditor also alleges that Debtor made a false oath or account in connection with the
case by listing the value of the QDRO as "unknown" in his bankruptcy schedule and by not
accounting for the Missing Money in his schedules. The Court finds the evidence
insufficient to establish that Debtor made either of these statements with the requisite
fraudulent intent to deceive creditors as required by section 727(a)(4)(A). First, the Court
has already stated its opinion with regards to the Missing Money in its discussion of
Creditor's section 727(a)(5) cause of action. The Court found Debtor's explanation as to the
whereabouts of the Missing Money to be unsatisfactory. But, the Court finds that Creditor
did not prove the requisite fraudulent intent.

Second, the Court does not find Debtor's scheduled valuation of the QDRO payment
as "unknown" to have been fraudulent and/or made with the intent to deceive. The Court
finds that Debtor honestly did not know the value of the QDRO payment at the Petition
Date. Although no specific date has been established, Debtor's testimony did provide that
the QDRO payment was not received until sometime after Debtor filed for bankruptcy.
Furthermore, absent the request of the trustee, Debtor has no ongoing duty to update the
trustee as to the value of an asset listed as "unknown" in his schedules. *In re Adair,*

---

[6]    The Court also notes that any harm to creditors from these pre-petition transfers can be
reduced. See 11 U.S.C. § 547(b).

11

253 B.R. 85, 89 (9th Cir. BAP 2000).  Denial of discharge under section 727(a)(4)(A) is not

appropriate.

## SECTION 523(a)(2)(A) NON-DISCHARGEABILITY CLAIM

### A.    Debtor Did Not Intend To Defraud Creditor.

The Court's denial of discharge under section 727(a)(5) renders a decision on the

section 523(a)(2)(A) claim for non-dischargeability of debt unnecessary.  Notwithstanding,

the Court finds that the Creditor fails on its section 523(a)(2)(A) cause of action and, again,

provides a brief analysis.

"A discharge under section 727 of this title does not discharge an individual debtor

from any debt . . . for money, property, services, or an extension, renewal, or refinancing of

credit, to the extent obtained by . . . false pretenses, a false representation, or actual

fraud . . ." 11 U.S.C. § 523(a)(2)(A).  To prove actual fraud in the Ninth Circuit, a creditor

must establish each of the following elements:  (1) that the debtor made the representations;

(2) that at the time he knew they were false; (3) that he made them with the intention and

purpose of deceiving the creditor; (4) that the creditor relied on such representations; [and]

(5) that the creditor sustained the alleged loss and damage as the proximate result of the

representations having been made. *Britton v. Price (In re Britton)*, 950 F.2d 602, 604

(9th Cir. 1991).  The creditor must prove each element by a preponderance of the evidence.

*Grogan v. Garner*, 498 U.S. 279, 290 (1991).

Courts must be particularly concerned with promises made at debt origination as:

"courts naturally are concerned lest every breach of contract be levered into fraud by the

too-facile expedient of asking the jury to infer from the fact that the defendant did not

perform his promise that he never intended to perform it.  So the rule has grown up that

nonperformance is not enough to ground such an inference; there must be additional

evidence of the defendant's intentions at the time he made the promise." *Milwaukee Auction*

*Galleries, Ltd. et al. v. Chalk*, 13 F.3d 1107, 1109 (7th Cir. 1994).

12

The debtor's intent to deceive may be inferred by circumstantial evidence under the "totality of the circumstances" test. Under the relevant test, the Court "may infer the existence of the debtor's intent not to pay if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *In re Eashai,* 87 F.3d 1082, 1087 (9th. Cir. 1996). Neither the debtor's testimony about his subjective intent nor any objective inferences drawn from the circumstances is, by itself, legally dispositive. *In re Ettell,* 188 F.3d 1141, 1145 (9th. Cir. 1999). The Court must balance the objective evidence against the witness's testimony and credibility. *Id.*

The Court finds that Creditor is unable to establish that Debtor intended to defraud Creditor at the time of making the alleged misrepresentations. Creditor relies on three instances of alleged misrepresentation: 1) Debtor agreed to and signed the Fee Agreement, agreeing to pay all fees incurred; 2) on multiple occasions, Debtor misrepresented that he would use the Equalization Payment to satisfy his debts to Creditor; and 3) Debtor misrepresented that he would use the QDRO payment to satisfy his debts to Creditor. The Court finds that none of the three scenarios, either individually or collectively, establish that Debtor intended not to pay Creditor at the time of making the alleged misrepresentations.

First, the Court finds that Debtor intended to pay Creditor at the time of signing the Fee Agreement on August 28, 2006. Immediately after signing the Fee Agreement, Debtor made payments to Creditor, and, as of July 31, 2007, Debtor had paid Creditor in full for all fees incurred. Ex. 2.[7] The Court finds the Debtor's payments and his trial testimony to be conclusive evidence that Debtor did not sign the Fee Agreement with an intent not to pay Creditor.

Second, the Court does not find that the Debtor intended not to pay Creditor at the times of making the various alleged representations that Debtor would use the Equalization Payment to satisfy his debts to Creditor. The Court is skeptical that any representations made by Debtor were affirmative promises that the Equalization Payment would be used to

---

[7]    Invoices dated September 29, 2006 and July 31, 2007.

13

pay his debts. The representations seem to consist, more correctly, of Debtor being coaxed into acknowledging that the Equalization Payment could be used to pay his debts.

The testimony by Ms. Vallejo is the only evidence suggesting that Debtor made any affirmative promise to use the Equalization Payment to satisfy his debts. But, Ms. Vallejo was uncertain as to when, specifically, Debtor made such representation, stating that she believed it was right before Debtor's dissolution trial, which occurred in April 2008.[8] The Creditor's only remaining evidence of Debtor's alleged misrepresentations consists of multiple accounts of the following: Debtor expressing concerns to Creditor regarding his ability to pay his legal fees; Debtor being reassured that the Equalization Payment would be available to pay any incurred fees; Debtor hesitantly agreeing/acknowledging that the Equalization Payment would be available. In fact, at trial Ms. Martinez, the attorney directly representing Debtor in the dissolution, admitted that Debtor never affirmatively promised to pay with the Equalization Payment, but rather she assumed that Debtor would use the Equalization Payment for such payment. Tr.139:19-25. Due to the lack of specific accounts of Debtor affirmatively promising to use the Equalization Payment to settle his account, the Court is of the opinion that the Debtor merely acknowledged the availability of the Equalization Payment to satisfy his debts. Furthermore, the Court believes, at most, that Debtor doubted his ability to pay his debts; but the Court finds this to fall far short of the requisite intent not to pay Creditor.

Third, the Court does not find that Debtor intended not to pay Creditor at the time of the alleged representation that Debtor would use the QDRO payment to satisfy his debts. The only evidence regarding the alleged QDRO representation involves a phone conversation between Debtor and Ms. Vallejo on June 10, 2008. There is conflicting evidence as to whether Debtor made a promise to use the QDRO to pay his debts or whether Debtor only asked the status of the QDRO payment recovery. Furthermore, the Creditor cannot establish detrimental reliance on this statement; Creditor ceased providing services to

---

[8]    Given this timing, Plaintiff could establish detrimental reliance as to only $759.75. All other fees were generated prior to any alleged fraudulent representation by Debtor.

14

Debtor prior to this time as no further charges were imposed on Debtor after the May 31 2008 invoice. Ex. 2. Given these uncertainties, the Court finds the alleged representation regarding QDRO payment to be insufficient to establish non-dischargeability under section 523(a)(2)(A).

Thus, under the totality of the circumstances, the Court finds insufficient evidence from which to infer that Debtor intended not to pay Creditor. Further, Creditor cannot establish the requisite reliance. Therefore, the Court finds that Creditor's section 523(a)(2)(A) action fails.

## ENFORCEABILITY OF FEE AGREEMENT AND CHARGING LIEN

**A.    Creditor's Fee Agreement Is Voidable At Debtor's Option.**

The Court finds that Creditor's Fee Agreement fails to comply with California Business & Professions Code § 6148(a) due to Creditor's failure, at the time of contract, to provide Debtor with a duplicate copy of the contract signed by both the attorney [Creditor] and the client [Debtor]. Creditor admits its failure to sign the Fee Agreement. Therefore, the Court finds the Fee Agreement to be voidable at the option of Debtor. See Cal. Bus. & Prof. Code § 6148(c).

If Debtor opts to void the Fee Agreement, Creditor remains entitled to collect a reasonable fee. Cal. Bus. & Prof. Code § 6148(c). In light of the denial of Debtor's discharge, the Court believes that determination of the amount of a "reasonable fee" for Creditor's service would be best handled by the parties and, if necessary, by the state court.[9]

**B.    Creditor's Charging Lien Is Unenforceable.**

The Court's determination that the Fee Agreement is voidable at Debtor's option renders moot the Creditor's alleged charging lien in the event Debtor exercises his option. Even if the Debtor were not to exercise this option, however, the Court finds that the

---

[9]    The chapter 7 trustee appointed in Debtor's bankruptcy case filed a Report of No Distribution, concluding that there are no assets to administer for the benefit of creditors of the estate, and rendering it unnecessary for any creditors to file proofs of claim. (Docket #10). Therefore, determination of the Creditor's fee amount would have no impact on the administration

1 | Creditor's asserted lien is a lien adverse to the interest of the client, Debtor, and is, therefore,
2 | unenforceable based on Creditor's failure to comply with the requirements of California
3 | Rule of Professional Conduct 3-300 ("Rule 3-300"). *See Fletcher v. Davis*, 33 Cal. 4th 61
4 | (2004).

5 |      The Creditor's lien is a charging lien because it is a security interest in the proceeds
6 | of Debtor's litigation. Creditor, by securing payment of fees under the Fee Agreement
7 | through acquisition of a charging lien against Debtor's future judgment or recovery, thereby
8 | acquired an interest adverse to Debtor. Therefore, under governing California state law,
9 | Creditor is required to comply with the requirements of Rule 3-300 to have an enforceable
10 | lien.

11 |      Creditor failed to comply with requirement (B) of Rule 3-300, and, therefore,
12 | Creditor's lien against the proceeds of Debtor's litigation (in effect, the Equalization
13 | Payment) is unenforceable. Rule 3-300(B) requires that Creditor, *in writing*, advise Debtor
14 | that he may seek the advice of an independent lawyer. The Fee Agreement provided by
15 | Creditor and signed by Debtor contains no such provision. Creditor provides no other
16 | evidence of compliance with this requirement. Therefore, the Court finds that Creditor's
17 | charging lien is unenforceable against Debtor.

18 |      The Court briefly addresses Creditor's argument that the lien as to the retainer
19 | agreement should be evaluated solely under Rule 4-200 and the unconscionability standard,
20 | because Rule 3-300 makes reference to Rule 4-200. The Court finds that Creditor has
21 | misinterpreted Rule 3-300. In the discussion section following Rule 3-300, a comment
22 | states that: "Rule 3-300 is not intended to apply to the agreement by which the member is
23 | retained by the client, *unless* the agreement confers on the member an ownership,
24 | possessory, security, or other pecuniary interest adverse to the client. Such an agreement is
25 | governed, in part, by rule 4-200." Comment, Cal. Rules Prof'l Conduct, Rule 3-300 (2010)
26 | (emphasis added). Although compliance with Rule 4-200 is also required, this does not
27 | mean, as Creditor alleges, that Rule 3-300 no longer applies. Fees charged may never be

28 |

of the case.

16

1  unconscionable, and in addition, if an interest adverse to a client is undertaken, then the

2  requirements of Rule 3-300 must be met.  Here, Creditor never complied with at least one

3  requirement of Rule 3-300.  Argument that the fees are not unconscionable does not

4  overcome this deficiency.

5

6  **CROSS-CLAIM – ALLEGED TRUTH IN LENDING ACT VIOLATION**

7  Debtor presented no evidence at trial, and made no legal arguments, in either his trial

8  brief or Closing Brief, to support the Cross-Claim.  The Cross-Claim itself is a two-page

9  minimal pleading.[10]  Lacking evidence and/or legal argument, the Court finds no basis to

10  award any judgment to Debtor on the Cross-Claim.  Based on the Court's independent

11  review, the Court concurs with the argument presented in Creditors' Closing Brief that the

12  Truth in Lending Act is inapplicable to Creditor's business relationship with Debtor.[11]

13  Creditor appears to have made this argument purely in an abundance of caution in light of

14  the lack of evidence or argument advanced by Debtor at trial.

15

16  **CONCLUSION**

17  Based on the foregoing, the Court finds that Creditor is entitled to judgment denying

18  Debtor's discharge under 11 U.S.C. § 727(a)(5) and that Debtor is not entitled to judgment

19  under the Cross-Claim.  Creditor must provide a form of judgment to the Court within

20  fourteen days of this Memorandum Decision.

21  DATED:        April 23, 2010

22  LAURA S. TAYLOR, JUDGE
   United States Bankruptcy Court

23

24  [10]    The factual allegation in the Cross-Claim that the Fee Agreement provides for payment of interest at the rate of 1.5% per month is not supported by the Court's review of Exhibit 1.

25  [11]    Section 1602 of Title 15, in relevant part provides that: "'creditor' refers only to a person

26  who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for

27  which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of

28  indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(f).
   Debtor presented no evidence that Creditor (a law firm) fits within this definition.

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In re In re: Samuel E. Singh, Bankruptcy No. 08-07659-LT7
Marcus Family Law Center, PLC v. Samuel E. Singh, Adversary No.  08-90513-LT

### CERTIFICATE OF MAILING

The undersigned, a regularly appointed and qualified clerk in the office of the United States Bankruptcy Court for the Southern District of California, at San Diego, hereby certifies that a true copy of the attached document, to wit:

### MEMORANDUM DECISION

was enclosed in a sealed envelope bearing the lawful frank of the bankruptcy judges and mailed to each of the parties at their respective addresses listed below:

John F. Lenderman
Attorney at Law
303 South 8th Street
El Centro, CA 92243

Ethan J. Marcus
Marcus Family Law Center, PLC
732 State Street
El Centro, CA 92243

*Trustee*
Gregory A. Akers
P. O. Box 26219
San Diego, CA 92196

Office of the United States Trustee
Southern District of California
402 West Broadway, Suite 600
San Diego, CA 92101-5109

Said envelope(s) containing such document was deposited by me in a regular United States Mail Box in the City of San Diego, in said District on April 23, 2010.

Regina A. Fabre, Judicial Assistant